# IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **TUBE CITY IMS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **11-519** |
| **PAYNE SUPERIOR** | ) | |
| **AUTOMOTIVE, INC. d/b/a** | ) | |
| **SUPERIOR AUTOMOTIVE;** | ) | |
| **DIVERSIFIED MILL** | ) | **JURY TRIAL DEMANDED** |
| **CONTRACTORS, INC.; THS** | ) | |
| **INVESTMENTS, INC. d/b/a** | ) | |
| **TARRANT HYDRAULICS;** | ) | |
| **WILLIAM C. PAYNE; DAVID** | ) | |
| **CHAPMAN; CHRIS R.** | ) | |
| **HENDERSON; and TIMOTHY H.** | ) | |
| **MIDDLETON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW Tube City IMS, LLC ("TCIMS") and files this Complaint

against Defendants Payne Superior Automotive, Inc. d/b/a Superior Automotive

("Superior Automotive"), Diversified Mill Contractors, Inc. ("DMC"), THS

Investments, Inc. d/b/a Tarrant Hydraulics ("Tarrant Hydraulics"), William C. Payne

("Payne"), David Chapman ("Chapman"), Chris R. Henderson ("Henderson"), and Timothy H. Middleton ("Middleton") (all collectively referred to as "Defendants").

**Statement of Jurisdiction and Venue**

1.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), as this action involves a federal question, and 28 U.S.C. § 1332, as there is complete diversity among TCIMS and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction to hear TCIMS's state law claims pursuant to 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

2.

TCIMS is a limited liability company organized and existing under the laws of the State of Delaware, and maintains its principal place of business at 12 Monongahela Avenue, Glassport, Pennsylvania 15045.

3.

Chapman is subject to the jurisdiction and venue of this Court and can be served at this residence at 3375 Ching Dairy Road, Mobile, Alabama 36618.

4.

Middleton is subject to the jurisdiction and venue of this Court, and can be served at his residence at 221 Rob Drive, McIntosh, Alabama 36553.

5.

Henderson is subject to the jurisdiction and venue of this Court and can be served at his residence at 8241 Barrie Drive, Theodore, Alabama 36582.

6.

Payne is subject to the jurisdiction and venue of this Court, and can be served at his residence at 5007 Highway 43 S., McIntosh, Alabama 36553

7.

DMC is a corporation that was organized under the laws of the State of Alabama, having its principal place of business in either Washington or Mobile County, Alabama.  DMC is subject to the jurisdiction and venue of this Court and can be served by service upon its registered agent, Michael Cole, 1300 Schillinger Road S. Lot 4, Mobile, Alabama 36695.

8.

Superior Automotive is a corporation organized under the laws of the State of Alabama having its principal place of business at 5007 Highway 43 S., McIntosh, Alabama 36553.  Superior Automotive is subject to the jurisdiction and venue of this Court and can be served by service upon its registered agent, Payne, at Superior

Automotive's principal place of business.

9.

Tarrant Hydraulics is a corporation organized under the laws of the State of Alabama, having its principal place of business at 1407 Pinson Street, Tarrant, Alabama 35217. Tarrant Hydraulics is subject to the jurisdiction and venue of this Court and can be served by service upon its registered agent, Keith Wade, at 1407 Pinson Street, Tarrant, Alabama 35217.

**Facts**

10.

TCIMS is an imbedded contractor at the SSAB steel mill in Axis, Mobile County, Alabama. TCIMS contracts with steel mills to provide material handling services to supply scrap and recycled byproducts from the steel making process to steel mills. With the SSAB mill site, TCIMS, among other things, handles and transports scrap metal materials that are delivered to the mill site either by train, barge, or truck. After the scrap is delivered to the mill, TCIMS unloads, sorts, manages, and delivers the scrap to the particular mill site so that it can be converted by SSAB into steel coils or plates. TCIMS also retrieves byproducts generated by the steel making process at the SSAB mill so that they can either be sold to third parties, recycled, or if not recyclable, transported to an appropriate land fill.

4

11.

TCIMS has employed since January 2007 an average of 181 employees at the SSAB mill site, including an average of 11 maintenance workers.  Maintenance workers at the mill site perform a variety of jobs, including general maintenance and repair on a wide range of heavy equipment utilized at the mill site and they construct and repair the facilities, buildings, and other structures utilized by employees of TCIMS in the performance of their duties at the site.  Maintenance workers also repair the enormous cast iron slag pots used by TCIMS to retrieve the molten slag from the mill.  These slag pots crack periodically, requiring TCIMS maintenance workers to "cut-out" the cracks and then weld the crack together.

12.

Chapman was a General Manager for TCIMS at the SSAB mill site from April 24, 2007 to May 25, 2011.  As a General Manager, Chapman was responsible for, among other duties, the administration of all business functions of the site with full responsibility for the use of TCIMS's assets and personnel to achieve maximum profitability; the implementation and administration of all TCIMS policies as they pertain to operations, sales, and accounting; the direction of subordinates in the administration and servicing of all customer contracts; and the direction of the site accounting and bookkeeping regarding fixed asset control and accounts payable.

5

13.

Middleton was the Maintenance Manager for TCIMS at the SSAB mill site from May 1, 2007 to February 2011. As a Maintenance Manager, Middleton was responsible for, among other duties, directing, implementing, and coordinating the maintenance practices, standards, and procedures of TCIMS to ensure effective maintenance, and utilization of all site equipment, determining justification for replacement and repair of capital equipment, and ensuring that TCIMS's internal bookkeeping and information management systems were correctly utilized with respect to the repair, replacement, and purchase of TCIMS equipment.

14.

Henderson was the Safety Coordinator for TCIMS at the SSAB mill site from April 2, 2007 to May 25, 2011. As the Safety Coordinator, Henderson was responsible for, among other duties, managing the site safety program and assisting the site manager with typical operational management responsibilities related to production and employee supervision.

15.

Payne is the owner of Superior Automotive and the director of DMC. Payne is a long time and childhood friend of Middleton.

**The DMC Scheme**

16.

In or around May 2008, Chapman, Middleton, and Henderson with the cooperation and assistance of Payne established DMC.  Payne was the sole incorporator and the sole director of DMC.  The physical address for DMC is identified as 1300 Schillinger Road S., Lot 4, Mobile, Alabama.  Upon information and belief, this address is for a unit at a storage facility.

17.

Beginning from in or about May 2008 through in or about October 2008, at the direction or with the consent of Chapman, Middleton, and Henderson, TCIMS contracted with DMC for slag pot welding repairs.  Chapman, Middleton, and Henderson caused TCIMS to contract for, and pay for, slag pot welding despite the fact that there was no need for TCIMS to utilize outside contractors for this work as it had been performed internally by TCIMS's maintenance workers before and after the period in which DMC performed these services.

18.

DMC charged TCIMS, and TCIMS paid DMC, approximately $121,825 for pot welding services over a period of less than six months.  These charges were grossly excessive for the work performed.  Despite knowing the services of DMC were not

7

needed and the charges were excessive, Chapman, Middleton, and Henderson ordered that the work be performed, accepted the invoices, and directed that TCIMS pay for the excessive and fraudulent work.

19.

DMC retained two welders to perform this pot welding work.  One of the retained welders was an eighteen year old recent high school graduate with no welding experience, who was paid $10.00 an hour.  The DMC welders used TCIMS's welding equipment and materials, with the permission of Chapman, Middleton, and Henderson, and with no remuneration to TCIMS.

20.

Payments made by TCIMS to DMC were received by Payne, who then paid Henderson and Middleton either by cash or by check.  Henderson and Middleton would then pay Chapman in cash for his "take" in the scheme.

21.

Upon information and belief, Chapman, Middleton, and Henderson improperly received, and TCIMS has been damaged in the amount of, approximately $84,000 from the DMC Scheme.

22.

In May 2011, Chapman, Middleton, and Henderson each individually admitted

8

to participation in the DMC scheme.

23.

As part of the DMC Scheme, Payne and DMC submitted fraudulent invoices to TCIMS causing the U.S. Mail and interstate wires to be utilized in the submission of these invoices to TCIMS's headquarters and for the payment of these invoices from TCIMS's headquarters to Payne and DMC as described herein.  For example, between May 18, 2008 and September 13, 2008, DMC and Payne submitted thirty-one (31) invoices to TCIMS for the welding and repair of pot cracks at the SSAB Site.  The amount billed on each invoice was $2,750.

24.

As part of the DMC Scheme, Chapman, Middleton, and Henderson caused TCIMS to issue checks payments to Payne and DMC via interstate wire and U.S. Mail based on the fraudulent invoices that had been submitted.  For example, the following checks were issued by TCIMS based on the above-described fraudulent invoices: 1) Check No. 731702, issued on 6/20/08 for $2,750; 2) Check No. 733173, issued on 7/11/08 for $850; and 3) Check No. 739991, issued on 10/07/08 for $5,500.

25.

On or about November 7, 2008, TCIMS received a call from the company's compliance or fraud hotline number from a wife of a former TCIMS employee.  The

caller claimed that Middleton had verbally abused her husband and that Middleton was contracting with his friends to perform work for TCIMS at the SSAB site. When the former employee was called, he told the TCIMS auditor to look into DMC and Superior Automotive. When the auditor met with Payne, Payne falsely represented to the auditor the true nature of DMC and the ownership of DMC. Further, Payne and Chapman misrepresented to the auditor the need and true cost of the DMC work. Based on the misrepresentations of Payne and Chapman, the TCIMS auditor failed to uncover the fraud perpetrated by Payne, Chapman, Middleton, and Henderson. However, as a result of the investigation, Payne, Chapman, Middleton, and Henderson "shut down" the DMC Scheme.

26.

Despite shutting down the DMC Scheme, Payne continued to issue checks on DMC's account to Henderson and Middleton (and for later cash disbursement to Chapman) so as to, upon information and belief, facilitate the continued operation of the Superior Automotive Scheme.

**The Superior Automotive Scheme**

27.

Soon after becoming TCIMS's maintenance superintendent at the SSAB site, Middleton ordered that all glass work at the site be performed by Superior

Automotive.

28.

Middleton then began a systematic process of ordering replacements of glass on various equipment at the site (loaders, cranes, locomotives, dump trucks, etc.), without a prior issuance of a purchase order, even though the glass in the equipment did not need replacement. Around November 2007, Superior Automotive, under the direction of Middleton, and with the implicit or express approval of Chapman, began appearing almost daily at the work site, making unnecessary and costly glass installations, sometimes replacing the same glass on the same equipment over and over again often within days of the last replacement.

29.

Upon information and belief, Superior Automotive billed TCIMS for and TCIMS paid for safety glass or shatterproof glass but regular glass was installed by Superior Automotive instead.

30.

Superior Automotive grossly overcharged TCIMS, with the approval of or under the direction of Middleton or Chapman, for the work it performed at the SSAB mill site. For instance, on one occasion, Middleton told Payne that the invoice submitted by Payne on behalf of Superior Automotive was "not high enough." When

Payne increased the invoice at Middleton's direction, Middleton rejected the invoice and repeated that the invoice was "not high enough." After Payne increased the invoice a second time, Middleton again rejected the invoice and told him that the invoice was "not high enough." After Payne increased the invoice for a third time, Middleton accepted the invoice and caused a purchase order to be issued by TCIMS for the fraudulent and inflated invoice, which was ultimately paid by TCIMS.

31.

Superior Automotive also purchased used trucks from TCIMS and sold used trucks to TCIMS for use at the SSAB mill site. Superior Automotive also performed maintenance and repair work on TCIMS's trucks.

32.

Superior Automotive paid TCIMS less than the fair market value of the trucks it purchased and charged TCIMS more than the fair market value for the trucks it sold to TCIMS. Often the trucks TCIMS purchased from Superior Automotive for replacement of the trucks it sold Superior Automotive were of inferior quality and condition than the trucks TCIMS sold Superior Automotive. In addition, Superior Automotive purchased from Middleton, or Middleton's family, at least one truck that it later sold to TCIMS at an inflated price.

12

33.

As with the glass work performed by Superior Automotive, Superior Automotive performed unnecessary repairs at grossly inflated prices on TCIMS's trucks which were paid by TCIMS at the direction or consent of Chapman and Middleton.

34.

Payne, as an agent of Superior Automotive, paid "kick backs" directly to Middleton, and possibly others, in the form of cash and other items of benefit to Middleton. Payne would come to Middleton's office at the SSAB mill site where they would then meet behind closed doors outside of the presence of others at the site. Middleton would later then emerge from his meeting with Payne with a bundle of cash in a $1,000 band that he showed to other employees at TCIMS. Middleton would taunt employees, after his meetings with Payne, by saying "let's match money" and then pull out a bundle of cash.

35.

Although this investigation is ongoing, TCIMS believes it has been damaged as a result of the Superior Automotive Scheme in the amount of approximately $100,000 to $120,000.

36.

As part of the Superior Automotive Scheme, Superior Automotive submitted fraudulent invoices to TCIMS causing the U.S. Mail and interstate wires to be utilized in the submission of these invoices to TCIMS's headquarters and for the payment of these invoices from TCIMS's headquarters to Superior Automotive as described herein.   For example, between July 11, 2008 and July 17, 2008 alone, Superior Automotive submitted the following invoices to TCIMS for the replacement of the same 32x40 windshield on the very same machine at the SSAB site: 1) Invoice No. 4995, issued on 7/11/08 for $847.10; 2) Invoice No. 4996, issued on 7/12/08 for $422.10; and 3) Invoice No. 5000, issued on 7/17/08 for $847.10.   As another example, between March 3 and March 5, 2008, Superior Automotive submitted the following invoices to TCIMS for the replacement of the same 32x40 windshield on the very same machine at the SSAB site: Invoice No. 4877, issued on March 3, 2008 for $690.28 and Invoice No. 4878, issued on March 5, 2008 for $532.30.   Later, between July 10 and July 29, 2008, Superior Automotive submitted the following invoices to TCIMS for the replacement of the same 32x40 window on the very same machine at the SSAB site: Invoice No. 4994 issued on July 10, 2008 for $807.10 and Invoice No. 5019 issued on July 29, 2008 for $1,428.70.

37.

As part of the Superior Automotive Scheme, Chapman and Middleton caused

14

TCIMS to issue checks payments to Superior Automotive via interstate wire and U.S. Mail based on the fraudulent invoices that had been submitted. For example, the following checks were issued by TCIMS based on the above-described fraudulent invoices: 1) Check No. 737311, issued on 9/5/08 for $3,133.00; 2) Check No. 727734 issued on April 18, 2008 for $1,730.43; 3) Check No. 728205, issued on April 25, 2008, for $696.30; 4) Check No. 736824, issued on 8/29/08 for $807.10; and 5) Check No. 737787, issued on 9/12/08 for $1,787.20.

## The Tarrant Hydraulics Scheme

### 38.

Tarrant Hydraulics, headquartered in Birmingham with an office in Axis, Alabama, provided cylinders, cylinder rebuilds, hoses, and other services to TCIMS at the SSAB mill site. Tarrant Hydraulics was the primary supplier for cylinders and cylinder rebuilds for TCIMS at its Axis site. In fact, Middleton directed that all cylinders and cylinder rebuilds, for which Tarrant was qualified to provide products or service, be purchased from Tarrant Hydraulics.

### 39.

Tarrant Hydraulics provided these services to TCIMS at its Tuscaloosa Nucor site as well as in its SSAB Axis site. Although the Nucor site is admittedly smaller than the SSAB site, from a given period from 2007 through 2011, Tarrant Hydraulics

15

billed TCIMS $142,338.39 for work at its Tuscaloosa site versus $1,169,384.67 at its Axis site. The respective sizes of the operations between Tuscaloosa and Axis cannot explain this significant discrepancy. Rather, this discrepancy can only be explained by the fraudulent billing practices and fraudulent services provided by Tarrant Hydraulics that were permitted, encouraged, and accepted by Middleton, Chapman, and Henderson.

40.

An employee of TCIMS observed that TCIMS purchased cylinders from Tarrant Hydraulics costing $6,000 one week and then purchased the very same cylinder from Tarrant Hydraulics at Middleton's direction one week later for $13,000. One employee observed a cylinder having been quoted at $3,000 but purchased from Tarrant Hydraulics at Middleton's direction at the cost of $9,000. Another employee recalls cylinders being replaced by Tarrant Hydraulics at Middleton's direction or approval although the cylinders were not broken or damaged. The same employee discovered that the amount billed by Tarrant Hydraulics and approved by Middleton for payment for refurbishing one cylinder was more than the cost of two new identical cylinders from a Tarrant Hydraulics competitor.

41.

Other employees of TCIMS questioned the services provided by Tarrant

Case 1:11-cv-00519-WS-B   Document 1   Filed 09/09/11   Page 17 of 54

Hydraulics and believed that Tarrant Hydraulics on a number of occasions did not rebuild or refurbish a cylinder but merely repainted the cylinder and charged TCIMS for the services anyway at the direction of Middleton.

42.

Other employees questioned the frequency in which Tarrant Hydraulics made repairs to cylinders at the site.  In fact, under Middleton's direction and supervision, certain equipment at the SSAB mill site was allowed to remain in such condition that the cylinders were guaranteed to be damaged during normal operations of the equipment, necessitating the need for Tarrant Hydraulics to make repeated and costly repairs to the same cylinders.

43.

Upon information and belief, Tarrant Hydraulics paid "kick backs" to Middleton in the form of cash, automobile racing equipment or other automobile supplies, and other items of value.  In fact, Middleton was known to be "very tight" with Chris Edmonds, the primary sales person at Tarrant Hydraulics responsible for the TCIMS account.  Edmonds and Middleton would often meet behind closed doors in Middleton's TCIMS office.  Edmonds was observed on one occasion handing Middleton an envelope believed to be full of cash before Middleton was able to close the door to his office.  Subsequent to his termination from TCIMS, Middleton was

17

hired by Tarrant Hydraulics.

44.

Although the investigation is continuing, TCIMS believes that it has suffered damages from the Tarrant Hydraulics Scheme in an amount of $500,000 to $600,000.

45.

As part of the Tarrant Hydraulics Scheme, Tarrant Hydralics submitted fraudulent invoices to TCIMS from 2007 to 2011 causing the U.S. Mail and interstate wires to be utilized in the submission of these invoices to TCIMS's headquarters and for the payment of these invoices from TCIMS's headquarters to Tarrant Hydraulics as described herein. For example, Tarrant Hydraulics submitted the following invoices to TCIMS for the replacement or repair of cylinders at the SSAB Site: 1) Invoice No.65796, issued on 3/10/08 for $1,306.25; 2) Invoice No. 65795, issued on 3/10/08 for $1,306.25; 3) Invoice No. 65776, issued on 3/7/08 for $1,306.25; 4) Invoice No. 65777, issued on 3/7/08 for $1,306.25; 5) Invoice No. 65931, issued on 3/20/08 for $1,045.00; 6) Invoice No. 65932, issued on 3/20/08 for 1,045.00; 7) Invoice No. 72053, issued on 813/09 for $1,103.15, 8) Invoice No. 72320, issued on 9/3/09 for $2,641.79; 9) Invoice No. 76155, issued on 7/6/10 for $1,133.71; 10) Invoice No. 76287, issued on 7/13/10 for $2,281.12.

46.

As part of the Tarrant Hydraulics Scheme, Middleton, Chapman, and Henderson caused TCIMS to issue checks payments to Tarrant Hydraulics via interstate wire and U.S. Mail based on the fraudulent invoices that had been submitted. For example, the following checks were issued by TCIMS based on the above-described fraudulent invoices: 1) Check No. 728206, issued on 4/25/08 for $26,932.03; 2) Check No. 729099, issued on 5/18/08 for $12,776.28; 3) Check No. 759084, issued on 10/2/09 for $4,236.06; 4) Check No. 760323, issued on 10/23/09 for $8,577.97; 5) Check No. 776782, issued on 8/20/10 for $2,172.74; 6) Check No. 777184, issued on 8/27/10 for $9,375.72.

## The Ace Construction Scheme

47.

In the spring of 2008, at the direction and control of Henderson and Chapman, TCIMS contracted with "Ace Construction" for installation of flooring in a portion of TCIMS's administrative trailer at the SSAB mill site, painting for a portion of that trailer, and for the construction of stairs and appurtenant decking to two office trailers at the site.

48.

This work took place from in or about June 2008 to in or about November

19

2008.  Henderson and Chapman caused TCIMS to pay "Ace Construction" $114,610 for this work.  In addition, Henderson and Chapman permitted "Ace Construction" to use TCIMS's VISA credit card to purchase from Lowe's tools and supplies, allegedly used in the construction, in an amount of $15,442.  "Ace Construction" also used the credit card to purchase items that were entirely personal in nature, such as gatorade, water, and batteries.

49.

The work performed by "Ace Construction" was of inferior quality, and "Ace Construction" was caused by Henderson and Chapman to be grossly overpaid by TCIMS for the inferior work performed.  In fact, TCIMS could have purchased two or three new office trailers for the amount paid to "Ace Construction" for only the installation of flooring, stairs, and the appurtenant decking and limited painting.

50.

The work performed by "Ace Construction" was of inferior quality and could have been performed internally by TCIMS with its own maintenance crew.  Indeed, as in the DMC Scheme, TCIMS uses its maintenance crew, except in the instance when it utilized "Ace Construction," to perform the very work that "Ace Construction" performed at the site.

20

51.

It was later discovered that there is no "Ace Construction" that performed work at the site; rather, purchase orders and payments, under the direction and control of Henderson and Chapman, were directed to a "Eric Landry" ("Landry"), who is the alter ego for "Ace Construction."

52.

Upon information and belief, Henderson and Chapman, with the express or tacit approval or assistance of Middleton, received "kick backs" from the payments made to Landry.  Although its investigation is ongoing, TCIMS believes that it has suffered damages of approximately $100,000 as a result of the "Ace Construction" Scheme.

53.

As part of the Ace Construction Scheme, Landry submitted fraudulent invoices to TCIMS causing the U.S. Mail and interstate wires to be utilized in the submission of these invoices to TCIMS's headquarters and for the payment of these invoices from TCIMS's headquarters to Landry as described herein.  For example, Landry submitted the following invoices to TCIMS: 1) Invoice No. 3, issued on 6/22/08 in the amount of $5,500 for tile floors; 2) Invoice No. 5, issued on 7/2/08 in the amount of $5,500 for painting, walls, lights, and floors; 3) Invoice No. 1112, issued on 8/7/08

21

in the amount of $5,500 for replacing wall, paneling, and lights; 4) Invoice No. 13, issued on 8/11/08 in the amount of $2,500.00 for hanging cabinets and new doors and windows.

54.

As part of the Ace Construction Scheme, Chapman, Middleton, and Henderson caused TCIMS to issue checks payments to Landry via interstate wire and U.S. Mail based on the fraudulent invoices that had been submitted.  For example, the following checks were issued by TCIMS based on the above-described fraudulent invoices: 1) Check No. 734189, issued on 7/25/08 for $5,500; 2) Check No. 735097, issued on 8/8/08 for $9,700; and 3) Check No. 736103, issued on 8/28/08 for $15,800.  In addition, as set forth above, Landry used TCIMS's Lowe's credit card to purchase supplies, tools, and items for personal consumption costing $15,442.

### The Gulf Coast Industrial Services Scheme

55.

In the fall of 2008, at the direction of and under the control of Henderson and Chapman, TCIMS contracted with a "Gulf Coast Industrial Services" to provide welding and fabrication services to TCIMS at the SSAB mill site.

56.

Like in the DMC Scheme and the Ace Construction Scheme, the work

22

performed by "Gulf Coast Industrial Services" could have been performed internally by TCIMS using its own maintenance crew. Indeed, TCIMS has used its own maintenance crews to perform the very same type of work performed by "Gulf Coast Industrial Services" before and after "Gulf Coast Industrial Services" worked at the SSAB mill site. In fact, TCIMS's maintenance crews performed much of the work for which "Gulf Coast Industrial Services" billed TCIMS and for which TCIMS paid "Gulf Coast Industrial Services." In addition, TCIMS's maintenance crew on several different occasions, at the direction of Chapman, Middleton, and Henderson, cut steel plate and loaded the cut steel plate on vehicles and/or trailers belonging to "Gulf Coast Industrial Services." The steel plate was then surreptitiously removed from the mill site using a back exit at the site to avoid SSAB security. A portion of the steel plate was later used by "Gulf Coast Industrial Services" to build a pulpit (a small box building) at the direction of Henderson and Chapman. The pulpit was not needed and has never been used by TCIMS. The remaining steel plate provided to "Gulf Coast Industrial Services" has never been accounted for.

57.

The work performed by "Gulf Coast Industrial Services" was unnecessary and "Gulf Coast Industrial Services" grossly overcharged TCIMS, either at the direction of or with the approval of Henderson and Chapman. "Gulf Coast Industrial Services"

23

performed work on the site in or about October 2008 through in or about March 2009.

Henderson and Chapman caused TCIMS to pay "Gulf Coast Industrial Services"

$74,160 in response to these fraudulent and grossly inflated invoices.  Chapman and

Henderson directed these payments be made to 3758 Belle Isle Lane, Mobile,

Alabama 36619.  This address is for the residence of Johnny Bowen ("Bowen"), the

owner of Johnny's RV LLC.

58.

It was discovered in July 2011 that "Gulf Coast Industrial Services" is the alter

ego of Tony Dalton ("Dalton") and/or Bowen.  Dalton is an employee of Johnny's RV

in Theodore, Alabama.  The address provided by Dalton and Henderson to TCIMS

for "Gulf Coast Industrial Services" is the same address now used by Johnny's RV.

Upon information and belief, "Gulf Coast Industrial Services" formerly occupied the

building now used by Johnny's RV.  Dalton, Bowen, and Henderson utilized the

name and address of "Gulf Coast Industrial Services" in an effort to avoid TCIMS's

internal fraud control procedures.

59.

Chapman received "kick backs" from Dalton and Bowen in the form of

consulting fees paid by "Gulf Coast Industrial Services" by checks to Henderson.

Upon information and belief, Chapman received the use of a rental RV from Johnny's

24

RV at below fair market value, and Johnny's RV hired Chapman's son, Justin Chapman, as additional "kick backs" in consideration for his participation in the Gulf Coast Industrial Services Scheme.

60.

Although its investigation is ongoing, TCIMS believes that it has suffered approximately $40,000 in damages as a result of the Gulf Coast Industrial Services Scheme.

61.

As part of the Gulf Coast Industrial Services Scheme, Gulf Coast Industrial Services submitted fraudulent invoices to TCIMS causing the U.S. Mail and interstate wires to be utilized in the submission of these invoices to TCIMS's headquarters and for the payment of these invoices from TCIMS's headquarters to Gulf Coast Industrial Services as described herein. For example, Gulf Coast Industrial Services submitted the following invoices to TCIMS: 1) Invoice No. 2637, issued on 9/22/08 in the amount of $11,247.00 for a lime hopper chute; 2) Invoice No. 4178, issued on 3/29/09 in the amount of $22,640 for a 10x10x8 mill pulpit; and 3) Invoice No. 3427, issued on 11/3/08 in the amount of $5,148 for a tank liner.

62.

As part of the Gulf Coast Industrial Services Scheme, Chapman, Middleton,

and Henderson caused TCIMS to issue checks payments to Gulf Coast Industrial Services via interstate wire and U.S. Mail based on the fraudulent invoices that had been submitted.  For example, the following checks were issued by TCIMS based on the above-described fraudulent invoices: 1) Check No. 741504, issued on 11/7/08 for $11,247; 2) Check No. 749064, issued on 3/29/09 for $22,640; and 3) Check No. 746619, issued on 2/6/09 for $5,148.

**The Ongoing Concealment and Suppression of the Schemes**

63.

It is the well established policy of TCIMS to obtain bids from vendors prior to the goods being delivered or the services being provided.  Once a vendor bid is accepted, a purchase order is created and the order number is given to the vendor. The vendor is then instructed to put the purchase order number on the invoice in order to expedite the payment process.  The TCIMS site "receives" the purchase order on TCIMS's internal bookkeeping system when the service or goods are completed/delivered to the TCIMS site.  This receipting process creates the liability on the system and makes the purchase available for the matching/vouching process. When the invoice is sent electronically to the corporate office in Pennsylvania for payment, the accounts payable clerk matches/vouches the invoice to the purchase order (that is listed on the invoice and in the system), and the invoice is made ready

26

for payment.  Checks are then issued to the vendors from TCIMS's corporate office in Pennsylvania.

64.

Chapman, Middleton, and Henderson took several affirmative steps to avoid TCIMS's internal fraud control procedures in the continued operation of the DMC, Superior Automotive, Ace Construction, Tarrant Hydraulics, and Gulf Coast Industrial Systems Schemes.   First, Chapman, Middleton, and Henderson circumvented the TCIMS bidding process by excluding the purchase department at the SSAB mill site from bidding work to vendors.  In addition, vendor invoices were sent directly to the SSAB site rather then to TCIMS's corporate offices.  Further, Chapman, Middleton, and Henderson created purchase orders and "received" these purchase orders after vendor invoices were received at the SSAB site.  Also, purchase orders were created on vendor invoices that were not based on a quoted bid or in many cases on no quote at all in violation of TCIMS policy.  All of the fraudulent invoices at issue were approved by either Chapman or Middleton.

65.

In addition to the above, it is the standard practice of TCIMS for work orders to be created to assign cost to individual pieces of equipment.  This information is used by TCIMS for various purposes, such as bench marking and capital spending.

27

It is also utilized as a fraud control procedure to detect improper expenses to particular equipment. In this case, Chapman, Middleton, and Henderson failed on multiple occasions to charge the work performed by Superior Automotive to the equipment where the glass was allegedly installed. As to Tarrant Hydraulics, Chapman, Middleton, and Henderson failed to allocate the work to the correct unit or failed to allocate the work at all in violation of TCIMS's policy and practice.

66.

As another fraud control mechanism, capital items exceeding $5,000 or more are either added to the cost basis of the existing asset or an asset is established on the corporate list of fixed assets by the TCIMS site. Chapman was in control of and directed this procedure at the SSAB mill site. With fixed assets, useful life is established and the asset is expensed over this life. TCIMS policy requires that a Major Expenditure Request be prepared by the site and presented for approval to management for capital assets. Chapman avoided this procedure and this fraud control mechanism by failing to complete a Major Expenditure Request for the work performed by "Ace Construction" in violation of TCIMS's policy and practice.

67.

Another fraud control mechanism used by TCIMS requires the Site Superintendent to submit a form to TCIMS corporate offices for approval when a

28

fixed asset is disposed of or sold.  However, Chapman, in an effort to avoid this internal fraud control procedure, disposed of and sold company assets to Superior Automotive without removing the equipment from the fixed asset list for the site. Conversely, several assets that were purchased from Superior Automotive were never added to the site's fixed asset listing.  Rather, Chapman, in an effort to avoid TCIMS's internal fraud control procedures, recorded these assets in general expense accounts, operating supplies, and equipment/maintenance labor accounts in violation of TCIMS's policy and practice.

68.

As a General Manager, Chapman annually affirmed that he had read TCIMS's Company Conflict of Interest Policy and Code of Ethical Conduct and that he was in compliance with that policy.  In executing the "Statement of Compliance," Chapman suppressed and failed to disclose any information regarding his participation in the various above referenced schemes in violation of TCIMS's policies.

69.

Likewise, Chapman, Middleton, and Henderson each acknowledged their receipt of the Employee Handbook.  The Employee Handbook has an express conflict of interest policy that states, among other things, that it is a conflict of interest for an employee to:

29

1.   Work for, be associated with, provide any services or materials to or receive any compensation from any competitor of the Company.

2.   Have any financial interest (other than nominal stock interest in publicly held corporations) in any customer, potential customer, competitor, supplier, or vendor of the Company.

3.   Work for, be associated with or provide any services or materials to any customer, potential customer, or supplier or vendor of the Company, other than on behalf of the Company in the course of employment with the Company.

6.   Accept anything (including without limitation gifts, money or services) of more than nominal value from any customer, potential customer, supplier, or vendor of the Company.

70.

Further, TCIMS's employee handbook has an expressed Code of Ethical Conduct.  That Code of Ethical Conduct states: "An employee violates the Code of Ethical Conduct by engaging in unethical, dishonest, or illegal conduct that may cause harm of any nature to the Company, its employees, clients, vendors, suppliers, lenders, or any other person or entity that interacts with the Company. *** Violations of the Ethical Code of Conduct should be reported immediately to any of the following officers: CEO, Division President, or General Counsel."

71.

The Employee Handbook also has provisions that expressly pertain to "Candor

30

With Management and Auditors; Accounting Controls." This policy states that:

> It is the policy of the Company to maintain an accurate and effective system of internal accounting controls. The following principle shall govern the accounting treatment of all assets and payments of the Company:
> There shall be no unrecorded fund, asset or payment.
> No false or incompletely documented entry shall be made in the books or records.
> No payment shall be made or authorized with the knowledge or understanding that its purpose or effect is incorrectly described in the documentary records that support the payment.

72.

Although Chapman, Middleton, and Henderson acknowledged their understanding of their obligations and duties to TCIMS, they worked in concert with one another to violate these obligations and duties.

73.

In addition to the above referenced policies and internal fraud control procedures, TCIMS operates a company wide "fraud hotline" that is published and disseminated to all of its employees. Chapman, Middleton, and Henderson failed to utilize this hotline to report the fraud perpetrated by the others in the various schemes. Further, Chapman, in an effort to intimidate and harass the employees working under him at the SSAB mill site told employees at the site that calls to the fraud hotline were reported directly to him. Indeed, employees at the mill site thought that

31

Chapman's statement was true as employees who were known to have complained about suspected fraud at the site were ultimately terminated.

74.

In an effort to further intimidate employees of TCIMS from reporting their fraudulent activities, Chapman, Middleton, and Henderson would transfer employees who reported their suspicions of fraudulent activities away from areas in which they would have access to information concerning the fraudulent transactions. Further, Chapman, Henderson and Middleton would terminate or create false pretenses for which to terminate employees who reported or discussed their suspicions or who complained of the fraudulent conduct.

75.

When TCIMS internal auditors would inspect the SSAB mill site records, Henderson, Chapman and Middleton would conspire to disguise and suppress their fraudulent conduct.

**COUNT I**
**Violations of 18 U.S.C. § 1961, *et seq.***
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**(Against All Defendants)**

76.

TCIMS repeats and re-alleges the allegations contained in Paragraphs 1

through 75 as if more fully set forth herein.

77.

This is a civil RICO action brought pursuant to 18 U.S.C. § 1964(c) and (d).

78.

TCIMS is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

79.

Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 1962.

80.

Defendants participated in a scheme with the common goal of defrauding TCIMS through fraudulent invoices and kickback payments including, but not limited to, the DMC, Ace Construction, Superior Automotive, Tarrant Hydraulics, and Gulf Coast Industrial Services Schemes (these various Schemes are hereafter collectively referred to as "the TCIMS-Targeted Scheme").

81.

Defendants, acting in concert to implement, conduct, and conceal the TCIMS-Targeted Scheme, constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962 (the "Enterprise").

82.

Defendants were an owner of, employed by or associated with the Enterprise, which is engaged in, or the activities of which, affect interstate commerce, and Defendants conduced or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).

83.

Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c).  Each Defendant agreed to the overall objective of the TCIMS-Targeted Scheme (*i.e.*, the submission/payment of fraudulent invoices and the making/receiving of kickback payments) and committed two predicate acts in furtherance of the conspiracy, as set forth below.

84.

Each Defendant's participation in the Enterprise was essential to the success of the Enterprise's criminal aim and common purpose, namely defrauding TCIMS through kickback payments.

85.

In violation of 18 U.S.C. § 1962, Defendant have engaged in, or knowingly participated in, the operation or management of the Enterprise through a continuing,

related pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), by engaging in a series of two or more predicate acts of racketeering activity with ten years, including:

    (a)    Mail fraud in violation of 18 U.S.C. § 1341;

        i.    Defendants intentionally devised the TCIMS-Targeted Scheme to defraud TCIMS of its property and profits.

        ii.    Continually between 2007 and 2011, Defendants intentionally caused the U.S. Mail to be used for the purposes of executing, or attempting to execute the TCIMS-Targeted Scheme.

        iii.    The acts of mail fraud committed in furtherance of the DMC Scheme include, but are not limited to, the fraudulent invoices mailed to TCIMS and the checks that TCIMS mailed based on those invoices.

    (b)    Wire fraud in violation of 18 U.S.C. § 1343;

        i.    Defendants intentionally devised the TCIMS-Targeted Scheme to defraud TCIMS of its property and profits.

        ii.    Continually between 2007 and 2011, Defendants intentionally caused interstate wires to be used for the purposes of executing, or attempting to execute the TCIMS-Targeted Scheme.

iii.    Specifically, the acts of wire fraud committed by the Defendants include, but are not limited to, causing checks based on fraudulent invoices to be issued and deposited.

(c)    Transportation in interstate commerce of money or property stolen or taken by fraud in violation of 18 U.S.C. § 2314;

i.    Continually between 2007 and 2011, Defendants transported, transmitted and transferred, or caused to be transported, transmitted or transferred, in interstate commerce, TCIMS's money or property, which Defendants stole, converted, or fraudulently obtained through the TCIMS-Targeted Scheme.

ii.    The money or property that was stolen, converted or fraudulently obtained through the TCIMS-Targeted Scheme has a value of $5,000 or more.

iii.    Defendants knew that the money or property obtained through the TCIMS-Targeted Scheme was stolen, converted, or fraudulently obtained.

iv.    Some of the fraudulent mail/wire transmissions made as part of the TCIMS-Targeted Scheme are enumerated above.

36

(d)     Receiving, possessing, concealing, storing, selling or disposing of any goods, wares, merchandise or money, which have crossed state lines after being stolen, in violation of 18 U.S.C. § 2315;

      i.     Defendants received, possessed, concealed, stored, or disposed of stolen, converted or fraudulently obtained money or property worth more than $5,000 through the TCIMS-Targeted Scheme.

      ii.    Defendants knew that the money or property obtained through the TCIMS-Targeted Scheme had been stolen, converted or fraudulently obtained.

      iii.   Defendants knew that the money or property obtained through the TCIMS-Targeted Scheme crossed a state boundary after having been stolen, converted, or fraudulently obtained.

(e)     Interstate travel or use of mail in aid of racketeering activities in violation of 18 U.S.C. § 1952;

      i.     Continually between 2007 and 2011, Defendants used, or caused other persons to use, the U.S. mail as part of interstate commerce to promote, manage, establish, carry on, or facilitate the

promotion, management, establishment, or carrying on, of the TCIMS-Targeted Scheme.

    ii.    A list of some of the fraudulent mail transmissions made as part of the TCIMS-Targeted Scheme are enumerated above.

(f)    Laundering of Monetary Instruments in violation of 18 U.S.C. § 1956;

    i.    Defendants knowingly conducted or attempted to conduct financial transactions involving the proceeds from unlawful activity with the intent of carrying on the unlawful activity.

    ii.    Specifically, Defendants caused checks to be issued or deposited representing payment for the fraudulent invoices submitted to TCIMS.  Further, in exchange for the payments received from TCIMS based on the fraudulent invoices, Superior Automotive, DMC, Tarrant Hydraulics, and Payne provided kickback payments to Chapman, Henderson, and Middleton.

    iii.    Some of the invoices and checks issued as part of the TCIMS-Targeted Scheme are described above.

(g)    Engaging in monetary transactions in property acquired by unlawful activity in violation of 18 U.S.C. § 1957;

    i.    Defendants knowingly engaged or attempted to engage in

38

      monetary transactions that they knew involved property derived from their unlawful activity and participation in the TCIMS-Targeted Scheme.

    ii.    The monetary transactions related to the TCIMS-Targeted Scheme affected or involved interstate commerce and involved property worth more than $10,000.

86.

The predicate acts described above were all made with the purpose of defrauding TCIMS through the TCIMS-Targeted Scheme. Further, the acts occurred over a substantial period of time and occurred frequently enough to constitute the regular way of doing business for the Defendants.

87.

TCIMS sustained injury to its business and property by Defendants' violations of 18 U.S.C. § 1962 within the meaning of 18 U.S.C. § 1964, and TCIMS is entitled to treble damages and its attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c) in an amount to be proven at trial.

**COUNT II**
**Breach of Fiduciary Duty**
**(Against Chapman, Middleton, and Henderson)**

88.

TCIMS incorporates by reference and repeats and realleges Paragraphs 1-87 as if fully set forth herein.

89.

In their respective positions with TCIMS, Chapman, Middleton, and Henderson owed a fiduciary duty to TCIMS, and were required to act at all times and in all circumstances, with due regard for the interests of TCIMS, and with the utmost good faith, fair dealing, and loyalty.

90.

Chapman, Middleton, and Henderson's actions, as set forth in Paragraphs 10-75 above, including, but not limited to, their participation in and concealment of the DMC, Superior Automotive, Tarrant Hydraulics, Ace Construction, and Gulf Coast Industrial Services Schemes, were undertaken in derogation of their fiduciary duties to TCIMS, in furtherance of their own self interest, and with reckless and conscience indifference to the rights of TCIMS.

91.

As a result of Chapman, Middleton, and Henderson's actions, TCIMS has

40

suffered damages including, but not limited to, financial loss, harm to its business operations and profitability, and damage to its reputation.

## COUNT III
### Breach of the Duty of Loyalty
### (Against Chapman, Middleton, and Henderson)

92.

TCIMS incorporates by reference and repeats and realleges Paragraph 1-91 as if fully set forth herein.

93.

As employees of TCIMS with their respective positions of responsibility, Chapman, Middleton, and Henderson owed a duty of loyalty to TCIMS.

94.

Chapman, Middleton, and Henderson's actions, as set forth in Paragraph 10-75 above, including, but not limited to their participation in and concealment of the DMC, Superior Automotive, Tarrant Hydraulics, Ace Construction, and Gulf Coast Industrial Services Schemes were undertaken in derogation of this duty of loyalty to TCIMS, in furtherance of their own self interests, and with reckless and conscience indifference to the rights of TCIMS.

95.

As a result of Chapman, Middleton, and Henderson's actions, TCIMS has

suffered damages including, but not limited to financial loss, harm to its business operations and profitability, and damages to its reputation.

## COUNT IV
## Tortuous Interference with Contractual or Business Relations
## (Against All Defendants)

96.

TCIMS incorporates by reference and repeats and realleges Paragraph 1-95 as if fully set forth herein.

97.

TCIMS had a contractual or business relation with Chapman, Middleton, and Henderson as well as contractual or business relations with its vendors that provided goods and services to TCIMS at the SSAB mill site.

98.

Defendants had knowledge of these contractual or business relations.

99.

Payne, DMC, Superior Automotive, and Tarrant Hydraulics intentionally interfered with these business relations by their actions, as set forth in Paragraph 10-75 above, including, but not limited to, their respective participation in the DMC, Superior Automotive, and Tarrant Hydraulics Schemes and their inducement of Chapman, Middleton, and Henderson to breach their contractual and business

relations with TCIMS.

100.

Likewise, Chapman, Middleton, and Henderson intentionally interfered with these business and contractual relations by their malicious and intentional actions taken outside of the line and scope of their employment with TCIMS, as set forth in Paragraph 10-75 and Paragraphs 88-95 above, including, but not limited to, their respective participation and concealment of the DMC, Superior Automotive, Tarrant Hydraulics, Ace Construction, and Gulf Coast Industrial Services Schemes.

101.

As a result of Defendants' actions, TCIMS has suffered damages, including, but not limited to, financial loss, harm to its business operations and profitability, and damage to its reputation.

## COUNT V
### Fraud
### (Against All Defendants)

102.

TCIMS incorporates by reference and repeats and realleges Paragraph 1-101 as if fully set forth herein.

103.

43

Defendants made false representations of fact and engaged in deceitful and duplicitous conduct as set forth in Paragraphs 10-75 above, including, but not limited to, their respective participation in the DMC, Superior Automotive, Tarrant Hydraulics, Ace Construction, and Gulf Coast Industrial Services Schemes and in their submission of the fraudulent invoices and purchase orders in relation to those Schemes, with full knowledge that such representations and conduct were false and fraudulent and material to TCIMS's decision-making with respect to TCIMS's operations, in furtherance of their own self's interest, and with reckless and conscience indifference to the rights of TCIMS.

104.

TCIMS relied on Defendants' false and fraudulent representations of fact and deceitful and duplicitous conduct in making decisions with respect to TCIMS's business operations.

105.

As a result of Defendants' fraud, including the submission of fraudulent invoices to TCIMS for payment, and Chapman, Middleton, and Henderson's acts of concealment of that fraud by their intimidation of employees at the SSAB mill site to not call the fraud hotline, their misrepresentations to TCIMS internal auditors and senior management, and their manipulation of TCIMS's purchasing and bookkeeping

44

procedures to circumvent TCIMS's internal fraud control procedure, TCIMS did not discover the fraud, including the DMC, Superior Automotive, Tarrant Hydraulics, Ace Construction, and Gulf Coast Industrial Services Schemes until TCIMS was told of some of the schemes by Middleton on May 17, 2011 and later told of some of the other schemes by Payne on May 24, 2011.

106.

As a result of Defendants' false and fraudulent representations of fact and deceitful and duplicitous conduct, TCIMS has suffered damages, including but not limited to, financial loss, harm to its business operations and profitability, and damage to its reputation.

## COUNT VI
## Negligence and Wantonness
## (Against Chapman, Middleton, and Henderson)

107.

TCIMS incorporates by reference and repeats and realleges Paragraphs 1-106 as if fully set forth herein.

108.

Chapman, Middleton, and Henderson each owed TCIMS a duty to exercise ordinary care in the performance of their respective employment duties with TCIMS.

109.

45

Chapman, Middleton, and Henderson breached their respective duties to TCIMS by negligently and/or wantonly failing to exercise ordinary care in the performance of their employment duties with TCIMS.

110.

Chapman, Middleton, and Henderson negligently and/or wantonly breached their duties to TCIMS by implementing, participating in, concealing, and profiting from the various schemes, including the DMC, Superior Automotive, Tarrant Hydraulics, Ace Construction, and Gulf Coast Industrial Services Schemes.

111.

As a result of Chapman, Middleton, and Henderson's negligent and wanton actions, TCIMS has suffered damages, including, but not limited to, financial loss, harm to its business operations and profitability, and damage to its reputation.

## COUNT VII
### Negligence and Wantonness
#### (Against Payne, Superior Automotive, DMC, and Tarrant Hydraulics)

112.

TCIMS incorporates by reference and repeats and realleges Paragraph 1-111 as if fully set forth herein.

113.

Payne, DMC, Superior Automotive, and Tarrant Hydraulics owed TCIMS a

duty of good faith and fair dealing and a duty of ordinary care.

114.

Payne, DMC, Superior Automotive, and Tarrant Hydraulics negligently and wantonly breached their duty of good faith and fair dealing and duty of ordinary care by implementing, participating in, concealing, and profiting from the various respective schemes, including, the DMC, Superior Automotive, Tarrant Hydraulics, Ace Construction, and Gulf Coast Industrial Services Schemes.

115.

As a result of Payne, DMC, Superior Automotive, and Tarrant Hydraulics's negligent and wanton actions, TCIMS has suffered damages, including but not limited to, financial loss, harm to its business operations and profitability, and damage to its reputation.

## COUNT VIII
## Negligent and/or Wanton Hiring, Training, Supervision and Retention
## (Against Tarrant Hydraulics and Superior Automotive)

116.

TCIMS incorporates by reference and repeats and realleges Paragraphs 1-115 as if fully set forth herein.

117.

Superior Automotive and Tarrant Hydraulics negligently and/or wantonly

hired, trained, supervised, and retained its employees with respect to fair business dealings with its customers.  Further, Superior Automotive and Tarrant Hydraulics negligently trained and supervised its employees to not participate in kick back schemes or provide kick backs or provide other things of value to its customers.

118.

Upon information and belief, Superior Automotive and Tarrant Hydraulics recklessly and/or wantonly encouraged its employees to provide kick backs or other forms of benefits or renumeration to its customers' employees by providing their sales people with cash, racing equipment and parts, and other goods to use as kick backs and other forms of illegal or improper benefits to employees of its customers.

119.

Superior Automotive and Tarrant Hydraulics negligently and/or wantonly retained employees that they knew, or should have known, were participating in illegal or improper "kick back" schemes.

120.

As a result of Superior Automotive and Tarrant Hydraulics's negligent and/or wanton hiring, training, supervision, and retention, TCIMS has suffered damages, including, but not limited to, financial loss, harm to its business operations and profitability, and damage to its reputation.

48

## COUNT IX
### Suppression
### (Against All Defendants)

121.

TCIMS incorporates by reference and repeats and realleges Paragraphs 1-120 as if fully set forth herein.

122.

Defendants falsely represented to TCIMS that the products sold to TCIMS and the services provided to TCIMS were accurately described and represented in the purchase orders and invoices reflecting the goods and services provided.

123.

Defendants concealed and withheld information from TCIMS as to the true nature of the goods and services provided to TCIMS so as to induce TCIMS to pay grossly inflated amounts for these false purchase orders and invoices.

124.

As a result of Defendants' fraud and their act of concealment of that fraud by the utilization of fraudulent purchase orders and invoices and by Chapman, Middleton, and Henderson's intimidation of TCIMS employees at the SSAB mill site to not call the fraud hotline, their misrepresentations to TCIMS internal auditors and senior management, and their manipulation of TCIMS's purchasing and bookkeeping

49

procedures to circumvent TCIMS's internal fraud control procedures, TCIMS did not discover the facts suppressed until TCIMS was told of the schemes by Middleton on May 17, 2011 and later told of some of the other schemes by Payne on May 24, 2011.

125.

As a result of Defendants' active suppression and concealment, TCIMS has suffered damages, including, but not limited to, financial loss, harm to its business operations and profitability, and damage to its reputation.

**COUNT X**
**Conversion**
**(Against Chapman and Middleton)**

126.

TCIMS incorporates by reference and repeats and realleges Paragraphs 1-125 as if fully set forth herein.

127.

Chapman, Middleton, and Henderson appropriated personal property belonging to TCIMS for their own use and benefit.

128.

Middleton with the assistance of another TCIMS employee placed a skid steer on his personal trailer and transported the skid steer through a back exit at the SSAB mill site so as to avoid SSAB security and delivered the skid steer to Chapman at his

50

personal residence.  Chapman has never returned the skid steer in question and has never accounted to TCIMS for the skid steer or the use of the skid steer.

129.

In addition, Middleton took a Lincoln welder and trailer and other equipment owned by TCIMS and sold the welder, trailer, and other equipment to a former employee of TCIMS for $500.00.  Some of the equipment sold, upon information and belief, is in the possession of Superior Automotive.

130.

In the same manner, Henderson took scrap, including aluminum radiators from TCIMS's cranes, that was owned by TCIMS, sold the scrap, and illegally retained the moneys received from the sales.

131.

As a result of Chapman and Middleton's conversion of property owned by TCIMS, TCIMS has suffered damages, including, but not limited to, the value of the property converted by Chapman and Middleton.

## COUNT XI
### Conspiracy
### (Against All Defendants)

132.

TCIMS incorporates by reference and repeats and realleges Paragraphs 1-131

as if fully set forth herein.

### 133.

Defendants conspired with one another to participate in, conceal, and profit from the improper and illegal DMC, Superior Automotive, Tarrant Hydraulics, Ace Construction, and Gulf Coast Industrial Services Schemes.

### 134.

As a result of Defendants' conspiracy to engage in these schemes, TCIMS has suffered damages, including but not limited to, financial loss, harm to its business operations and profitability, and damage to its reputation.

**Prayer for Relief**

WHEREFORE, TCIMS RESPECTFULLY REQUESTS THAT THIS COURT:

(A)   Enter judgment in favor of TCIMS and against all Defendants in an amount not less than $850,000.00;

(B)   Award TCIMS its attorneys' fees and expenses;

(C)   Award TCIMS punitive damages in an amount not less than $2,550,000.00;

(D)   award TCIMS treble damages pursuant to TCIMS's RICO claim;

(E)   hold Defendants jointly and severely liable; and

(F)   grant such other and further relief as is just, proper, and equitable.

**TCIMS respectfully requests a trial by jury on all counts.**

This the 9th Day of September, 2011.

Respectfully submitted,

/s/ Carter H. Dukes
Carter H. Dukes
State Bar ID: ASB-7231-D66C
John W. Scott
State Bar ID: ASB-1788-T68J
Joshua S. Thompson
State Bar ID: ASB-6793-O71T
Attorneys for Plaintiff
Tube City IMS, LLC

**OF COUNSEL:**
SCOTT DUKES & GEISLER, P.C.
211 22nd Street North
Birmingham, Alabama  35203
Telephone: (205) 251-2300

**Serve Defendants by Certified Mail:**

PAYNE SUPERIOR AUTOMOTIVE, INC. d/b/a SUPERIOR AUTOMOTIVE
c/o William C. Payne
5007 Highway 43 S.
McIntosh, Alabama 36553

DIVERSIFIED MILL CONTRACTORS
c/o Michael Cole
1300 Schillinger Road S. Lot 4
Mobile, Alabama 36695

53

THS INVESTMENTS, INC. d/b/a TARRANT HYDRAULICS
c/o Keith Wade
1407 Pinson Street
Tarrant, Alabama 35217

WILLIAM C. PAYNE
5007 Highway 43 S.
McIntosh, Alabama 36553

DAVID CHAPMAN
3375 Ching Dairy Road
Mobile, Alabama 36618

CHRIS R. HENDERSON
8241 Barrie Drive
Theodore, Alabama 36582

TIMOTHY H. MIDDLETON:
221 Rob Drive
McIntosh, Alabama 36553

61359.1